### RICH v. PELHAM HOD–ELEVATING CO.

(Supreme Court, Appellate Division, Second Department. December 31, 1897.)

1. NEGLIGENCE OF EMPLOYE—LIABILITY OF MASTER.
    Plaintiff's intestate, while passing through a cellar where he was at work, was fatally injured by the fall of an elevator owned by defendant. The elevator was used for carrying hods and wheelbarrows, and was operated by power from an engine in charge of one of defendant's employés. There was a footbrake and a friction lever for the regulation of its descent by the engineer, and a pawl or dog to hold it in place when elevated and at rest. At the time in question it fell rapidly from the fifth story with great force. There was no evidence that the pawl, the footbrake, and the lever were not in perfect condition, but there was evidence that the brake and lever were not applied by the engineer, and that he was not in a proper position to observe the fall or apply the means of checking the descent. *Held*, that the evidence was such as would support a finding of negligence in the management of the elevator.

2. SAME—CONTRIBUTORY NEGLIGENCE.
    The cellar was quite dark, the passageway which the deceased was required to use brought him quite close to the elevator, and the space occupied by the elevator, when lowered, was not clearly defined. Though there was a warning notice on the wall, it was in a dark place, and the lettering was indistinct. There was conflicting evidence as to whether and when the bell provided for signaling was rung. *Held*, that the evidence would warrant a finding of absence of contributory negligence.

3. SAME—DEFECTIVE APPLIANCES.

At the trial the plaintiff's counsel asked a witness, an engineer who operated a similar engine and elevator, "Do elevators of the kind that you have described, and which caused the injury complained of, generally have safety clutches?" An objection to this question as immaterial, irrelevant, and contrary to the facts was sustained. *Held* error.

Appeal from special term.

Action by Catherine Rich, as administratrix of Thomas Adlum, deceased, against the Pelham Hod-Elevating Company. From a judgment dismissing plaintiff's complaint, and denying a motion for a new trial, she appeals. Reversed.

Argued before GOODRICH, P. J., and CULLEN, BRADLEY, BARTLETT, and HATCH, JJ.

Ira Leo Bamberger, for appellant.

Eugene Lamb Richards (Arthur L. Sherer, on the brief), for respondent.

HATCH, J. The plaintiff was a laborer engaged in putting in coal into a building, in process of construction, in which was placed one of the defendant's elevators used for the purpose of elevating hods filled with mortar, and wheelbarrows loaded with brick, for use in the construction of the building. The elevator consisted of two grooved shafts or uprights running from the basement to the stories above. Between these shafts, and fitting into the grooves or shoes, was the elevating structure. It consisted of a wooden platform five to six feet square, which projected about two feet and a half on either side of the upright shafts. The platform rested upon the ground at the bottom of the cellar. It did not appear that there was anything to mark the space occupied by this platform when the elevator was raised, except what might be gathered from the uprights and a run used to wheel the barrows upon the platform. Two guides or runs were fastened to the platform which fitted into the grooves upon the upright shafts; a cross beam connected the two at the top. The structure was hoisted by means of a cable attached to the crossbeam, which ran through a pulley at the top; thence over another pulley at the top on the outside of one of the upright shafts, parallel with which it descended to the basement, passed through a pulley at the base of the upright, and thence to a drum, connected with an engine situated about 15 feet from the elevator structure, around which the cable wound when in process of hoisting, and unwound when it descended. The elevating power was furnished by the engine, and was under the control of the engineer. The process was to apply the power to the drum, and wind up the cable to hoist, and, when the elevator reached the required story in the building, it was stopped and held in place by means of a pawl or dog. which mashed into cogs or catches upon a wheel attached to the drum. thereby preventing any revolution of the drum. A bell was placed upon the wall near the elevator in the cellar, and was used as a signal for the engineer in hoisting and lowering the elevator. One ring of the bell was the signal to hoist and to stop, two bells to lower, and three to go easily, the last being a cautionary signal. So far as appears in the record,

these signals were given from the top, and the last man that took the load from the elevator gave the signal for descent, in the absence of any person specially employed for that purpose. The descent of the elevator was under the management of the engineer, and its speed was controlled by him by means of a footbrake and a friction lever operating upon the drum. As these were applied or loosened, the fall was checked or accelerated. This description of the elevator and the process of its operation is sufficient for present purposes.

The accident which is the subject of investigation was caused by a fall of the elevator from the fifth story of the building. It does not appear to have been under control, but came down with such rapidity that it broke the platform. The deceased, at the time, was passing the corner of the space occupied by the platform when down, was struck upon the foot by it, and sustained thereby a compound fracture of the foot, resulting subsequently in his death. The deceased was not employed by the persons operating the elevator, but by another firm, which furnished coal for use about the building, and for use in the engine used to operate the elevator. Consequently there was no relation of co-servant with the persons charged with the management of the elevator, and their negligence, if any, does not, therefore, constitute a risk assumed by him in his employment.

The motion for a dismissal of the complaint was based upon three grounds: First, that there was no evidence that the defendant or its servants were guilty of negligence; second, that there was no evidence that the deceased was free from contributory negligence; third, that the evidence affirmatively established that the deceased was guilty of contributory negligence. The court granted the motion without specification of the grounds upon which the ruling was based. We therefore assume that he regarded each ground stated as fatal to the maintenance of the action.

There is no proof as to what caused the elevator to fall. It is quite clear that the elevator could not fall if it reached the fifth story, and the pawl was put in place, unless it was thereafter removed or broken. There is no evidence that it was not in perfect condition. The elevator could have been regulated in its descent by the footbrake or the friction lever. There is no evidence that they were not in perfect order. There is evidence, however, sufficient to justify a finding that they were not applied by the engineer, and that the latter was not in a proper position to observe the fall or apply the means of checking the descent. A witness who was observing the engineer at the time when the elevator fell testified that the latter stood with his back to the engine, about five feet from the friction lever, and in a position where he could not see the elevator; that, in order to apply either the brake or the lever, the engineer was required to stand by the side of the engine, and in a position to see the elevator. This evidence is sufficient upon which to predicate a finding that the elevator was permitted to fall by substantially its own gravity, without any attempt made to check it. There is also proof showing the condition of the rope upon the drum after the accident, which tended to show that it had not been properly managed. This testimony, in connection with the conceded violence of the fall and its unusual char-

acter, is amply sufficient upon which to predicate negligence in the management of the elevator at the time. We also think that the evidence was sufficient from which the jury could find freedom from contributory negligence upon the part of the deceased. The evidence tended to show that it was quite dark in this basement; that it was incumbered with cement barrels and rubbish; and that the passageway leading to Broadway, which the deceased was required to use, brought him in close proximity to the elevator, and the barrels of coal which he was required to handle were in like manner close by it. It is quite evident that the space occupied by the platform upon the cellar floor was by no means clearly defined. When it was raised there was nothing to indicate this space except the uprights, which were only about 3x6 in size, and the run for the wheelbarrows. The first gave no indication. According to one witness, the run consisted of "a couple of old broken planks, with mud and dirt over them." It does not appear that it extended upon both sides, or to the corner where the deceased was caught, or that it was so raised or uniform in its character that observation would indicate that it had any connection with the elevator or the platform. Taken in connection with the surroundings, it was a question clearly for the jury to say how far it would apprise a person that the platform extended to that point. It is said that notice was given of the presence of the elevator, and that people were forbidden to pass under it. The evidence tended to show that the notice in question was placed upon the wall of the cellar about six or seven feet above the floor, in a place where it received but little light; that the board upon which it was given was dirty, by reason of which the letters were indistinct. Whether it could be read in the position in which it was placed, in its then condition, was a question for the jury; and, if it could be read, it would be still such question whether it conveyed warning sufficient to apprise a person, reasonably prudent, of the space occupied by the elevator, so that one, in the light of the place and the surrounding obstructions, could tell when he was under it. It is said that there was a bell which gave warning of the descent of the elevator. This bell was placed upon the cellar wall. How far from the elevator does not appear. It is quite clear that its office was not to warn any one of the descent of the elevator, but to signal the engineer when to hoist and when to lower. But, if we assume that it was for use as a warning, it is still a question for the jury whether it was so used upon this occasion. Two witnesses testified that they did not hear the bell ring. One witness, Dooley, testified that he "heard a bell rung just before they started the elevator down." Again he said: "After I heard the bell ring I seen Adlum walking towards the elevator, and I hollered to him. I shouted twice to look out, the elevator was coming down. By Mr. Bamberger: Q. At that moment it fell? A. Yes; the next instant the elevator was on him." It is evident from this testimony that the jury would be authorized to say that the ringing of the bell, the warning by Dooley, and the fall of the elevator were practically concurrent acts, and were of so sudden a character that the deceased did not have time to act upon either.

It is further suggested that Adlum had been in this place before,

and had knowledge of his surroundings. The extent of his knowledge, the opportunities he had before had for observation, and the ability to comprehend all that existed during the time he was there upon the day of the accident, as well as his then opportunity for that purpose, we think were clearly questions for the jury, and that the court was not justified in determining such questions as of law. The following authorities abundantly support the conclusions we have reached: Reed v. McCord, 18 App. Div. 381, 46 N. Y. Supp. 407; Schmitt v. Insurance Co., 13 App. Div. 120, 43 N. Y. Supp. 318; Holzmann v. Monell, 19 App. Div. 238, 46 N. Y. Supp. 129.

We are also of opinion that error was committed in rejecting testimony which was offered by the plaintiff upon the trial. Counsel for the plaintiff had extracted from the witness who observed the engineer that it was the duty of the latter to apply the brake and friction lever during the descent of the elevator. He then asked this question: "Q. And, in order to do that, was his face towards the elevator or towards the engine?" This was objected to as incompetent, irrelevant, and immaterial. The court sustained the objection, and plaintiff excepted. The evidence should have been received. The witness was an engineer, and operated one of these engines in connection with another and like elevator. He had described how the engineer stood when the elevator fell, and the question called for a fact as to whether, in his then position, he could apply the brake and lever. It was material testimony, and bore directly upon the negligence of the engineer. The witness was also asked this question: "Do elevators of the kind that you have described, and which caused the injury complained of in this case, generally have safety clutches?" This was objected to as immaterial and irrelevant, and contrary to the facts. The objection was sustained, and plaintiff excepted. The evidence was competent. The averment of the complaint was that this elevator was improperly constructed, for the want of proper appliances and appurtenances essential to its safe operation. It was therefore competent for plaintiff to establish this allegation by proof, if he could; and if he could show that a safety clutch was in general use upon elevators of this character, and that its lack was improper construction, he was entitled to show it as it bore directly upon the negligence of the defendant. Upon the oral argument it was urged by the respondent that safety clutches were never used upon such structures, and his objection was that the offer to prove differently was "contrary to the facts." If mere assertion was equivalent to fact, then the argument should be supported, and the evidence rejected. It is somewhat difficult, however, to see how plaintiff can overcome either, unless permitted to give testimony upon the point. If the respondent can succeed in preventing proof upon the subject, and have his assertion accepted as a conclusion of the fact and sufficient reason why none should be given, he surely occupies an enviable position. But we think the better rule is to receive the testimony, and therefore conclude that the ruling was error. There are other rulings which we are unable to sanction, but, as they will probably not arise upon another trial, we omit further discussion of them.

The judgment and order should be reversed, and a new trial granted, costs to abide the event. All concur.